MORGAN, LEWIS & BOCKIUS LLP
Geoffrey T. Holtz, Bar No. 191370
geoffrey.holtz@morganlewis.com
Leigha Beckman, Bar No. 334611
leigha.beckman@morganlewis.com
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Tel: +1.415.442.1000
Fax: +1.415.442.1001

Attorneys for Plaintiff
Accelalpha, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Accelalpha, Inc., a Washington Corporation,

Plaintiff,

vs.

Extreme Networks, Inc., a Delaware Corporation,

Defendant.

Case No. 5:24-cv-06915

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff Accelalpha, Inc., for its Complaint against Extreme Networks, Inc., alleges as follows:

## I. INTRODUCTION

1. This action for breach of contract arises out of an Independent Contractor Services Agreement entered into by Plaintiff Accelalpha and Defendant Extreme Networks on April 9, 2023 and the attached Statement of Work ("SOW") (hereinafter, the "Agreement"). *See* Exhibit A. Under the Agreement, Extreme Networks retained Accelalpha to design and implement certain Oracle software tools for Extreme Networks, and in return Extreme Networks agreed to pay Accelalpha on a time and materials basis based on the actual hours worked by the Accelalpha consultants, and to reimburse Accelalpha for certain costs such as travel expenses. During the course of the software implementation project, Accelalpha performed the work under the

Agreement, and Extreme Networks further requested and approved Accelalpha's performance of additional work as needs arose – for example additional deliverables, or additions or modifications to the scope of work – which Accelalpha then did perform. Extreme Networks has not disputed that Accelalpha performed the work that Extreme Networks requested and approved, nor did it timely identify any concrete problems or errors related to that work. But Extreme Networks has refused to pay nearly $2.8 million owing under the Agreement for the work performed. This action is to recover the sums that Extreme Networks owes to Accelalpha for the services that Accelalpha performed.

## II. PARTIES

2. Plaintiff Accelalpha, Inc. is a corporation organized under the laws of the State of Washington, with its principal place of business in Seattle, Washington.

3. Defendant Extreme Networks, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in San Jose, California.

## III. JURISDICTION AND VENUE

1. Federal diversity jurisdiction exists pursuant to 28 U.S.C. § 1332 because this action is between citizens of different states, and the amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.

4. Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b) as: (1) the parties' written Agreement, on which this action is based, specifies that "[a]ll disputes arising under this Agreement shall be brought in the Superior Court of California in Santa Clara County or the United States District Court for the Northern District of California in San Jose, as permitted by law"; (2) a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of California, and the majority of the services performed were with the involvement of or at the direction of personnel in the Extreme Networks offices in San Jose, California, including its Chief Information Officer; and (3) the parties' written Agreement specifies that Extreme Networks "ha[s] a principal place of business at 6480 Via Del Oro, San Jose, CA 95119," and it is subject to the court's personal jurisdiction.

## IV. INTRADISTRICT ASSIGNMENT

5. Assignment to the San Jose Division is proper pursuant to Civil L.R. 3-2(c). This action arises in San Jose because a substantial part of the events or omissions that give rise to the claim occurred in Santa Clara County. The parties' written Agreement specifies that Extreme Networks has a principal place of business in San Jose, California. The parties' written Agreement, on which this action is based, specifies that "[a]ll disputes arising under this Agreement shall be brought in . . . the United States District Court for the Northern District of California in San Jose."

## V. FACTUAL ALLEGATIONS

6. Extreme Networks is a publicly-traded provider of wired and wireless networking products and services. In early 2023, Extreme Networks launched a project to upgrade and replace a number of its internal computer systems. As one part of this larger project, Extreme Networks entered into the Agreement with Accelalpha, under which the latter was retained to work on Extreme Networks' implementation of Oracle's CPQ and SMC products. As Oracle describes it, the CPQ product (Configure, Price, Quote) is a cloud-based application that helps sellers configure the right mix of products or services and create accurate, professional quotes; and its SMC product (Subscription Management) is a fully integrated, cloud-based subscription management system for product- and service-based companies that simplifies the management of contracts, billing, and revenue.

7. Under the Agreement, the CPQ/SMC implementation was to be jointly performed, with certain tasks assigned to Accelalpha, others assigned to Extreme Networks, and others assigned jointly to both. Separately, Extreme Networks contracted with different consulting firms to handle other aspects of the broader implementation project. The "system map" set forth in the Agreement depicted various components of the broader project:




8. While Accelalpha's services under the Agreement were focused on implementing Oracle CPQ and SMC and related integrations, in parallel, another firm, EPAM Systems, Inc., was retained and was responsible for designing and updating Extreme Networks' instance of SalesForce to integrate with CPQ. EPAM's services constituted a critical path to completion, meaning that the Accelalpha portion of the overall project could be completed only as quickly as EPAM achieved its milestones, regardless of the pace or timing of Accelalpha's performance.

9. The Agreement set forth, at a general level, the anticipated scope for the Accelalpha project and the expected resources that would be required. Because these were set forth before the project commenced, and any project of this type can be expected to have unanticipated modifications or additions, the Agreement contemplated that the scope might change, reciting:

a. "The following is a summary of the effort and cost for consulting services associated to implementing Oracle CPQ and SMC. The scope and objectives will be reassessed during the Assess & Design phase. If it is determined that the initial implementation scope must change, this may affect the cost and schedule of the implementation effort. Any such changes, if required, will be handled using the Change Request (CR) process defined below." SOW § 8.

b. "The actual time and effort required to migrate data will depend on a number of factors, including the underlying data quality, the number of data transformations required, and the volume of records migrated." SOW § 4.F.

c. "The exact integration touchpoints will be determined during the Design phase." SOW § 4.G.

d. "Items not explicitly stated as in scope are deemed out of scope." SOW § 4.G.

10. As the project progressed through the design and implementation phases, the scope of the work that Extreme Networks requested and authorized Accelalpha to perform did, in fact, both change and expand. A list of additions to and changes in the scope of the project that Extreme Networks requested and authorized, which Accelalpha then performed using additional resources, includes but is not limited to the following:

a. The Agreement contemplated that Accelalpha would "[m]odify the existing commerce process for subscription selection and modifications (amend, renew, cancel, suspend, etc.)." SOW § IV(B)(3)(c). However, at Extreme Networks' request, Accelalpha designed and implemented an entirely new commerce process for these functionalities.

b. The Agreement contemplated that Accelalpha would "[l]everage the standard CPQ functionality to generate CPQ assets corresponding to SMC subscriptions." SOW § IV(B)(3)(e). However, at Extreme Networks' request, Accelalpha instead delivered a custom integration from SMC to CPQ to create assets.

c. The Agreement contemplated that Accelalpha would "[e]nable the standard CPQ Subscription Workbench, allowing users to search for and select subscriptions to Modify, Renew, or Terminate." SOW § IV(B)(3)(f). However, at Extreme Networks' request, Accelalpha instead implemented an entirely custom subscription workbench user interface that allowed for searching by asset, contract, or subscription.

d. The Agreement contemplated that Accelalpha would "[i]mplement a mix of serial or parallel quote approval process with . . . up to ten (10) reasons." SOW §

IV(B)(5)(1). However, at Extreme Networks' request, Accelalpha instead implemented 24 reasons, including custom functionality to enable the ability, when previously approved quotes are revised, to honor previous approvals if not impacted by changes when the quotes is resubmitted for approval, and custom preview of potential approvals prior to submitting.

e. Accelalpha implemented a number of additional application configurations at the request and/or approval of Extreme Networks, including:

i. RMA Management & CPQ Asset Update

ii. SFDC Partner Portal Customization

iii. Pricing models: multi-year discount, NFR discount, and proration

iv. Credit card payments process flow

v. Upsell functionality with automatic calculation of credit amount from existing lines and application as a discount to new lines, including the "Credit Determination" pricing model

vi. Master service agreements/contracts (MSA/MSC) solution

vii. Milestone billing

viii. Retrofitting a legacy commerce process to facilitate managing promotions

ix. A number of added functionalities for longtail renewals automation and exceptions/exclusions logic and longtail notifications

x. Custom identification of items pending renewal on a quote

xi. Renewal Line Item Renewal Preference

xii. Custom ability to replace one service on a line for another without deleting the line and adding another

xiii. Single SKU Bundle and Bundle/Child Part quoting

xiv. A serialization solution, including Search Line Item Grid by serial number and Products Serialization & Additional Asset Creation

xv. Quote Revision/Version functionality

xvi. Functionality to change partner and update permissions on an in-progress

quote

xvii. Ability to associate quote to a PO (purchase order), including functionality to submit multiple PO in single payload, additional PO / order entry fields, additional PO entry functionality, PO quote management - select POs to order

xviii. Quote to Order – Inflight Order Changes Management functionality

xix. Opportunity Contact Roles Consumption functionality

xx. Commerce rules, including 165 Transaction-level rules, 64 Transaction line-level rules, and Framework for 'hard' errors and 'soft' warning messages

xxi. Functionality to identify/exclude quotes from Distributor API

f. Accelalpha implemented a number of additional integrations (system or data connections within or between systems or applications) at the request and/or approval of Extreme Networks, including:

i. CPQ to EBS / ODS Integration for Approved Quotes

ii. EBS OM to CPQ Integration for Order Number and Order Line Number sync to Quote Lines

iii. Synchronization of Physical Assets data from SFDC /ODS to CPQ

iv. RMA Replacement related Asset and Contract Updates from EBS to SMC

v. BI Report from SMC to support creation of Renewal Opportunities in SFDC

vi. BI Report from SMC to support creation of Renewal Quotes in CPQ

vii. CPQ to SMC Synchronization of Physical and Associated Assets for Renewals

viii. Integration from CPQ to SMC for "Do Not Process" preference for quote lines during renewal process

ix. Integration from SFDC to CPQ for "Do Not Process" preference for quote lines during renewal process

x. Contract data from SMC to SFDC

xi. Subscription activation from SFDC to SMC

g. Accelalpha implemented a number of additional data conversions (transferring data to or from legacy systems or applications) at the request and/or approval of Extreme Networks, including:

i. Butterfly Data Migration - BMI Quote Migration Build

ii. Data migration field mapping, including Butterfly Data Migration - BMI Quotes Mapping and Quote Conversion Mapping - Legacy to CPQ

iii. Data conversion for SD WAN Quotes, including Butterfly Data Migration - SaaS/SDWAN Quotes Migration

h. Accelalpha implemented additional solutions at the request and/or approval of Extreme Networks, that were outside the original scope, including:

i. Master service agreements/contracts (MSA/MSC) solution

ii. Good Better Best (GBB AKA EP1) Use Cases

i. While these are some specific examples of the requested changes in scope from the original Agreement, during the course of Accelalpha's engagement, Extreme Networks requested additions or modifications to the scope for nearly every facet of the implementation project, including CPQ functionality for Upsell, Return for Credit, Bundles, Pricing, Renewals, and others, and Accelalpha provided the resources and performed the work that Extreme Networks had requested and/or authorized.

11. While the Agreement anticipated a formal process for written Statements of Work and/or Change Requests, in practice, both expressly and through a course of conduct, the parties established a process for Extreme Networks to request, authorize, and approve additional work and modified work by Accelalpha to be billed at standard rates for the time and materials. The Agreement specified that Accelalpha would provide a single Project Manager; however, in order to accommodate a request from Extreme Networks for additional project management resources, Accelalpha agreed to, and did, provide a second Project Manager. Extreme Networks agreed that

all other additional Accelalpha personnel and services that it requested and approved would be billable and that it would pay for such services.

12. The deliverables for the project generally proceeded in phases along a timeline, summarized in the SOW as follows:




13. The "Build" phase was organized into a number of stages called "Sprints" that would be completed within certain timeframes and after which Accelalpha would invoice Extreme Networks for the completed work. The project originally planned for 6 such Sprints, but with the additional and modified work that was requested and approved, the project was expanded to include 13 Sprints designated as Sprint 1 through Sprint 13.

14. Certain additions to and changes in the scope of the project that Extreme Networks requested and authorized were part of Sprints 1 through 13, and the parties followed a course of conduct to request and approve modifications to or additions to the work to be performed by Accelalpha and for Extreme Networks to agree to pay for and to pay for such work. Extreme Networks verbally requested and/or approved the additional Accelalpha work through regular or informal meetings and discussions. These additions and modifications were first documented informally and in the jointly-managed Program Plan, an Excel file to which both parties shared access. A draft Change Request was prepared for the additional Accelalpha work that was identified and approved as of September 2023. Accelalpha performed the additional work that Extreme Networks had authorized and invoiced Extreme Network for a portion of the additional work that had been completed. Extreme Networks paid more than $289,000 for additional work that it had approved which was outside the scope of the original SOW on Accelalpha invoices paid on October 3, 2023, December 21, 2023, January 3, 2024, and January 18, 2024. Extreme Networks paid $249,530 on April 12, 2024 for additional work that was invoiced, identified as

Sprint 7 and 8, and all of the work reflected in Sprint 7 and 8 was outside the scope of the original SOW. This confirmed the parties' course of conduct for Extreme Networks to authorize additional work beyond the original Agreement and SOW, for Accelalpha to perform the additional work and invoice Extreme Networks for it, and for Extreme Networks to pay for it.

15. The parties followed the same or a similar course of conduct for all additional work beyond the original Agreement and SOW that Accelalpha completed at Extreme Networks' request. Extreme Networks verbally requested and/or approved the additional Accelalpha work during project meetings and discussions, recorded in project documentation and the Program Plan. Accelalpha performed the additional work that Extreme Networks had authorized. Accelalpha prepared and circulated additional written Change Requests to Extreme Networks again memorializing the additional services and work product which Accelalpha approved. Accelalpha submitted the first written Change Request on or about December 19, 2023, and submitted a second written Change Request on or about April 22, 2024. The two written Change Requests are attached as Exhibit B. The second draft Change Request included work that Extreme Networks had requested and approved that Accelalpha had completed and work that had not yet been completed as of April 2024. It further noted that the figures were estimates for budgetary purposes only, and Accelalpha's consulting fees will be billed monthly for actual hours incurred, and that all travel expenses will be submitted separately. But Extreme Networks has refused to pay for the additional work that it requested and authorized, and which Accelalpha performed.

16. Although Extreme Networks has refused to pay for work that Accelalpha performed at Extreme Networks' request and with its authorization, Extreme Networks has continued to make use of, and benefit from, the services and deliverables that Accelalpha provided. This includes both work performed under the terms of the original SOW and additional work Extreme Networks requested and approved. Indeed, upon information and belief, Extreme Networks would be unable to continue with the broader implementation project without using the work product that Accelalpha provided for which Extreme Networks has refused to pay.

17. On information and belief, the portion of the project for which EPAM was

contracted was delayed and experienced problems, and Extreme Networks ultimately terminated EPAM from that part of the project and retained a different firm, PriceWaterhouseCoopers. Accelalpha played no part in these delays and problems, although they did affect Accelalpha's ability to complete performance on the contemplated schedule because certain aspects of Accelalpha's work depended on the completion of the EPAM portion of the project. At all times, Accelalpha remained willing and able to perform the services Extreme Networks had requested and authorized.

18. As another example of the parties' course of conduct, when the timing of the project was delayed due to EPAM's performance delays and other problems, the parties adjusted the project milestones and schedule without creating formal Change Requests to reflect the modified milestones and schedule, confirming the course of conduct to adjust the scope and schedule for the project services.

19. In June 2024, Accelalpha raised the issues of the additional work that it had performed at Extreme Network's request and with its approval, and the outstanding payments that were due for such work. On June 13, 2024, Extreme Networks responded by revoking system access to Accelalpha's engaged consultants, preventing Accelalpha from continuing to perform any services after that date and terminating the Agreement. Extreme Networks asserted that the SOW had expired. The Agreement includes a provision that allows Extreme Networks to terminate the Agreement. Agreement, § 8.2. The Agreement further provides that "Notwithstanding anything else to the contrary, this Agreement shall remain in effect as long as there is an underlying Statement of Work in effect." Agreement, § 8.1. The effect of Extreme Network's revoking Accelalpha's access, making any further work under the Agreement impossible, and its representation that the SOW had expired so that there was no Statement of Work in effect, was that the Agreement thus was terminated.

20. The Agreement includes an express, additional payment obligation that ripens upon termination. The Agreement states: "Upon termination of this Agreement, Company [Extreme Networks] shall promptly, but in any event within thirty (30) days following termination, pay to Contractor [Accelalpha] all unpaid amounts for services and/or accepted

deliverables or work product. If any deliverable or work product is not complete, Contractor [Accelalpha] shall deliver such incomplete deliverable and Company [Extreme Networks] shall pay the prorated value for such incomplete deliverable or work product." Agreement, § 8.4. Thus, upon Extreme Networks' decision to terminate the Agreement, it expressly assumed the obligations (a) to promptly pay to Accelalpha all unpaid amounts for (i) services Accelalpha had provided, (ii) accepted deliverables Accelalpha had provided, and (iii) work product Accelalpha had provided, and also (b) for any deliverable or work product that was not complete at the time of termination, to promptly pay Accelalpha the prorated value for such incomplete deliverable or work product that Accelalpha had delivered. This separate payment obligation, included in the Agreement, which was provided by and drafted by Extreme Networks, expressly applies without any conditions, such as a formal written SOW or Change Request or other approvals. Extreme Networks has not paid the sums owing under the Agreement.

21. In total, Accelalpha performed services requested and approved by Extreme Networks, both specified in the original SOW and modifications or additions beyond the SOW, devoting more than 33,000 hours of personnel time over a period of 62 weeks which, at agreed upon rates, total $4,407,540. This total includes both services for which Extreme Networks has paid and which remain unpaid as follows: Accelalpha performed invoiced, and was paid by Extreme Networks for certain of the services specified in the original SOW at agreed upon rates, in the amount of $1,076,250. Accelalpha performed certain additional services specified in the original SOW at agreed upon rates, but has not been paid by Extreme Networks, in the amount of $158,500. Accelalpha performed invoiced, and was paid by Extreme Networks for certain of the services not specified in the original SOW, but which Extreme Networks requested and approved, at agreed upon rates, in the amount of $538,817. Accelalpha performed additional services not specified in the original SOW but which Extreme Networks requested and approved, at agreed upon rates, but has not been paid by Extreme Networks, in the amount of $2,633,972. Thus, Extreme Networks owes to Accelalpha, but has refused to pay, a total of $2,792,472 for services and work product provided by Accelalpha that Extreme Networks requested and approved.

**FIRST CAUSE OF ACTION**

**Breach of Contract**

22. Plaintiffs re-allege and incorporate by reference the allegations set forth in the foregoing paragraphs.

23. Accelalpha and Extreme Networks entered into a written contract, the Independent Contractor Services Agreement, dated April 9, 2023, with an attached Statement of Work, attached as Exhibit A.

24. Further, Extreme Networks requested that Accelalpha perform additional specific software implementation services, at agreed upon rates, thereby making an offer. Accelalpha agreed to perform such specified services at agreed upon rates, thereby accepting the offer, and Extreme Networks agreed to pay for such services approving both the proposed services and amount to be paid. The services to be performed were memorialized in written Change Requests that Accelalpha provided to Extreme Networks, attached as Exhibit B, and in other project documentation, and Extreme Networks approved the additional work memorialized in the Change Requests and other project documentation. Based on these communications, Accelalpha reasonably believed, and did believe, that a contract with these terms resulted, and Extreme Networks could and should have reasonably concluded that a contract with these terms would result when Accelalpha accepted the offer and performed the requested and approved services.

25. Accelalpha performed the services as specified in the Agreement and SOW. Accelalpha further performed the additional services requested and approved by Extreme Networks that were modifications of or additions to those specified in the Agreement and SOW. Extreme Networks provided no timely notification to Accelalpha that any of the services or work product Accelalpha provided were incomplete, inadequate, or deficient. To the extent services remained to be performed, this is due to Extreme Networks' revocation of system access to Accelalpha's engaged consultants, preventing Accelalpha from continuing to perform any services and terminating the Agreement.

26. Extreme Networks breached the parties' written Agreement and SOW by refusing and failing to pay for services Accelalpha performed pursuant to that Agreement and SOW.

Extreme Networks breached the parties' further agreement or agreements by refusing and failing to pay for the additional agreed-upon services requested and approved by Extreme Networks and performed by Accelalpha that were modifications of or additions to those specified in the Agreement and SOW. Extreme Networks thereby breached the parties' agreement or agreements.

27. To the extent the Agreement or SOW specified certain formalities for a writing or otherwise for Extreme Networks to approve of additional work beyond the original SOW, and to the extent those formalities were not followed to the letter, the parties routinely waived such formalities for a writing or otherwise through a course of conduct by which Extreme Networks approved of additions or modifications to the work Accelalpha was to perform through formal and informal meetings, discussions and project documentation, for Accelalpha to perform the services, and for Accelalpha to seek and obtain payment from Extreme Networks.

28. Additionally, Extreme Networks terminated the Agreement when it revoked system access to Accelalpha's engaged consultants, preventing Accelalpha from continuing to perform any services and terminating the Agreement, and asserting that the SOW had expired. The effect of Extreme Network's revoking Accelalpha's access was to make any further work under the Agreement impossible, and its further representation that the SOW had expired was that there was no Statement of Work in effect, and the Agreement thus was terminated.

29. The Agreement, at § 8.4, requires that upon termination, Extreme Networks must promptly pay to Accelalpha all unpaid amounts for services and/or accepted deliverables or work product, and to pay the prorated value for any incomplete deliverables or work product. This independent payment obligation expressly applies to all services and work product provided by Accelalpha to Extreme Networks without any conditions, such as a formal written SOW or Change Request. Extreme Networks has refused to pay for the services and work product provided by Accelalpha to Extreme Networks and thus breached the Agreement.

30. Accelalpha was harmed by Extreme Networks' refusal to pay for the services performed, and Extreme Networks' breach of the parties' agreement or agreements by refusing to pay for those services was a substantial factor in causing Accelalpha's harm.

31. The damages suffered by Accelalpha as a result of Extreme Networks' breach and

refusal to pay totals $2,792,472.

32. Moreover, Extreme Networks has unjustly benefitted by using and continuing to use the work product produced by Accelalpha under the parties' agreement or agreements, for which Extreme Networks has failed and refused to pay Accelalpha.

**SECOND CAUSE OF ACTION**

**Quantum Meruit**

33. Plaintiffs re-allege and incorporate by reference the allegations set forth in the foregoing paragraphs.

34. Extreme Networks has disputed whether an express contract covers, in whole or in part, services that Accelalpha provided to Extreme Networks for which payment is still outstanding. On that basis, Accelalpha alleges, in the alternative to its breach of contract claim, that Accelalpha is entitled to recover in quantum meruit if it is determined that the parties' express agreement does not cover the subject matter of the dispute between Accelalpha and Extreme Networks in whole or part, that Accelalpha performed services that were outside of or over and above those contemplated by an express agreement in whole or part, or that the existing contract is void, invalid, or unenforceable in whole or part.

35. Accelalpha provided services and work product to Extreme Networks at its special instance and request. Extreme Networks knew that these services and work product were being provided and promised to pay the reasonable value for these services and work product. Accelalpha performed numerous and complex additional design and implementation services beyond those identified in the Agreement to Extreme Networks. Those additional services, which required additional resources at Accelalpha's expense, include but are not limited to those detailed above. The additional services performed by Accelalpha were made pursuant to requests and authorizations from Extreme Networks. For avoidance of doubt, every item in the list provided above was made pursuant to a request by, and approval from, Extreme Networks.

36. Extreme Networks in fact received the above referenced services and work product from Accelalpha. Extreme Networks requested the additional services, the parties discussed the specific services to be provided, and Extreme Networks authorized the services to be performed.

Accelalpha provided written project documentation, including but not limited to Change Requests, to Extreme Networks specifying the services provided or to be provided. Extreme Networks requested, authorized, and approved the additional work to be performed by Accelalpha and the hourly rates for the services provided. Both Accelalpha's internally maintained program tracker and its correspondence with Extreme Networks demonstrate that Accelalpha in fact performed the additional design and implementation work described herein, and tracked its status, completion, and cost.

37. The services performed by Accelalpha were intended to benefit Extreme Networks for the purpose of implementing Oracle CPQ and SMC and related integrations and functionality, and did in fact benefit Extreme Networks. Without Accelalpha's critical design and implementation efforts and services, Extreme Networks would not be able to migrate its system to a cloud-based system, the ultimate long-term goal of its work with Accelalpha.

38. The services at issue performed by Accelalpha were not provided gratuitously. As stated above, Extreme Networks requested and approved the additional services in advance, and Accelalpha performed the requested and/or approved services with the expectation that Extreme Networks would pay the invoiced amounts. To date, Accelalpha has provided services and work product to Extreme Networks at agreed upon billing rates totaling $2,792,472 which Accelalpha reasonably expects to be paid and which Extreme Networks refuses to pay.

39. Accelalpha's expectation that it will be paid for these services is reasonable. Over the course of the project, Accelalpha submitted multiple Change Requests and other written documentation modifying and expanding the scope of work described by the Agreement. The services and work product reflected in every Change Request and the other written documentation were approved by Extreme Networks.

40. For the same reason and based on the parties' past course of conduct, Extreme Networks knew or should have known that Accelalpha expected to be paid for services performed relating to, but beyond the initial scope of, the Agreement and SOW.

41. In total, Extreme Networks has received services and work product from Accelalpha amounting to a total value of $2,792,472 for which Accelalpha has not received

payment.

42. Accelalpha seeks payment and/or restitution of any such amounts by which Extreme Networks has been unjustly enriched at Accelalpha's expense.

**THIRD CAUSE OF ACTION**

**Unjust Enrichment**

43. Plaintiffs re-allege and incorporate by reference the allegations set forth in the foregoing paragraphs.

44. Extreme Networks has disputed whether an express contract covers, in whole or in part, services that Accelalpha provided to Extreme Networks for which payment is still outstanding. On that basis, Accelalpha alleges, in the alternative to its breach of contract claim, that Extreme Networks has been enriched by receiving and utilizing the $2,792,472 worth of services provided by Accelalpha for the design and implementation of Oracle CPQ and SMC and related integrations, for which Accelalpha has not been paid. Examples of the additional services performed by Accelalpha are described in detail above.

45. Over the course of the project under the Agreement, Extreme Networks requested and authorized additional services from Accelalpha, and Accelalpha submitted Change Requests and other written project documentation memorializing the agreed-upon modified or expanded scope of work. Accelalpha performed the services and provided the work product to Extreme Networks. For avoidance of doubt, every item listed above was added pursuant to a request by, and approval from, Extreme Networks.

46. Accelalpha performed numerous and complex additional design and implementation services beyond those identified in the original Agreement with Extreme Networks. Those additional services, which required additional resources at Accelalpha's expense, include but are not limited to those detailed above. The additional services performed by Plaintiff were made pursuant to requests and authorizations from Extreme Networks.

47. Extreme Networks has received the benefits of the services and work product delivered to it by Accelalpha by possession and use thereof. The services performed by Accelalpha were intended to benefit Extreme Networks for the purpose of implementing Oracle

CPQ and SMC and related integrations, and did in fact benefit Extreme Networks. Accelalpha personnel devoted tens of thousands of hours over a 63-week period to provide the services for Extreme Networks' benefit. Without Accelalpha's critical design and implementation efforts, Extreme Networks would not have the added functionality provided by Accelalpha and would be unable to migrate its system to a cloud-based system, the ultimate long-term goal of its work with Accelalpha.

48. In furnishing the services and work product to Extreme Networks, Accelalpha was not acting as a volunteer. Extreme Networks has accepted the benefits of the goods without payment in full to Accelalpha. Extreme Networks has no lawful justification for its enrichment at Accelalpha's expense as set forth above. Over the course of the project under the Agreement, Accelalpha submitted Change Requests and other written project documentation modifying or expanding the scope of work described by the Agreement. The services identified in every Change Request submitted by Accelalpha and other written documentation were approved by Extreme Networks. Extreme Networks has demonstrated through its past conduct that modifications and expansions of work necessary for Accelalpha to complete the requested and approved services would result in full payment by Extreme Networks. Extreme Networks has no lawful justification for retaining the benefit of Accelalpha's efforts without requisite payment.

49. Extreme Networks has been unjustly enriched and it would be inequitable for Extreme Networks to be allowed to retain the benefits of services and work product provided to Extreme Networks by Accelalpha without being ordered to pay to Accelalpha the sum of $2,792,472 together with interest at the legal rate. To the extent it is determined that the Agreement does not cover the subject matter of the dispute between Accelalpha and Extreme Networks in whole or part, that Accelalpha performed services that were outside of or over and above those contemplated by the existing contract in whole or part, then absent an unjust enrichment claim, Accelalpha will have no remedy to recover the benefit of which it was wrongfully deprived.

50. Accelalpha seeks $2,792,472 for which Extreme Networks was unjustly enriched to the detriment of Accelalpha.

**FOURTH CAUSE OF ACTION**

**Promissory Estoppel**

51. Plaintiffs re-allege and incorporate by reference the allegations set forth in the foregoing paragraphs.

52. To the extent it is determined that an enforceable contract is found not to cover services provided by Accelalpha to Extreme Networks, in whole or part, payment for such services by Extreme Networks is still owing under the doctrine of promissory estoppel.

53. Extreme Networks and Accelalpha had an express, written agreement, the Agreement and SOW, under which Accelalpha promised to perform services for Extreme Networks, and Extreme Networks promised to pay for such services. The Agreement expressly contemplated that the implementation scope may change, which may affect the cost and schedule of the implementation effort. The scope did, in fact change, and Extreme Networks requested that Accelalpha perform additional services at agreed-upon rates, and approved the services specified by the parties. Extreme Networks has disputed whether an express contract covers, in whole or in part, services that Accelalpha provided to Extreme Networks for which payment is still outstanding. Extreme Networks promised that it would pay for the services it requested and approved Accelalpha to provide. It was the reasonable expectation of Extreme Networks that Accelalpha would assign personnel and perform the services that Extreme Networks had requested and approved.

54. Accelalpha relied on this promise, and reasonably so, and took action to its detriment by assigning personnel to perform the services that Extreme Networks had requested and approved, and devoting tens of thousands of hours to performing those services and providing the resulting work product.

55. Injustice can be avoided only by enforcement of the promise because otherwise Accelalpha will have provided the services and work product to Extreme Networks that Extreme Networks requested and approved, without any payment for such services and work product, and therefore Extreme Networks' promise is binding.

56. Accelalpha seeks $2,792,472 which Accelalpha reasonably expected to be paid,

and which Extreme Networks reasonably should have expected to pay to Accelalpha, for the services and work product Accelalpha provided to Extreme Networks at Extreme Networks' request.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court enter judgment as follows:

a) Entering judgment awarding Accelalpha $2,792,472 for breach of contract;

b) In the alternative, entering judgment awarding Accelalpha $2,792,472 under the doctrine of quantum meruit;

c) In the alternative, entering judgment awarding Accelalpha $2,792,472 under the doctrine of unjust enrichment;

d) In the alternative, entering judgment awarding Accelalpha $2,792,472 under the doctrine of promissory estoppel;

e) Awarding Accelalpha pre-judgment and post-judgment interest to the full extent allowed under the law, as well as its costs; and

f) Granting such other and further relief as the Court deems just and proper.

**REQUEST FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this complaint that are so triable.

Dated: October 2, 2024

MORGAN, LEWIS & BOCKIUS LLP

By */s/ Geoffrey T. Holtz*

Geoffrey T. Holtz (SBN 191370)
Leigha Beckman (SBN 334611)
Attorneys for Plaintiff
Accelalpha, Inc.